UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

ALISSA MINICHINO,                      :
                                       :CIVIL ACTION NO. 3:12-CV-625
                Plaintiff,             :
                                       :(JUDGE CONABOY)
        v.                             :
                                       :
CAROLYN W. COLVIN, ACTING              :
COMMISSIONER OF SOCIAL SECURITY,[1]    :
                                       :
                Defendant.             :
                                       :

---

**MEMORANDUM**

Here we consider an appeal from the Commissioner's denial of Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 401-433, 1381-1383f.  (Doc. 1.)  For the reasons discussed below, we conclude remand to the Commissioner is required.

## I. Background

### A. *Procedural Background*

Plaintiff applied protectively for DIB and SSI on May 29, 2008, alleging disability since March 26, 2008.  (R. 204, 208.)  Plaintiff listed her illnesses, injuries, or conditions that limited her ability to work as "back problems and shorter leg, broken arms with numerous surgeries."  (R. 237.)  She stated that

---

[1]  Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013.  Substitution of Carolyn W. Colvin for Michael J. Astrue is appropriate pursuant to Rule 25(d) of the Federal Rules of Civil Procedure and the last sentence of 42 U.S.C. § 405(g).

these things affect her ability to work in that she is unable to carry or lift things, unable to sit or stand for too long and has a "[h]ard time walking, bad limp." (R. 237.) Plaintiff's claims were initially denied on May 13, 2009, because it was determined she was not disabled under Social Security rules. (R. at 96, 102.) Plaintiff requested a hearing before an administrative law judge ("ALJ") (R. 120), and a hearing was held before ALJ Daniel Myers on June 9, 2010 (R. 40). Plaintiff, who was represented by counsel, appeared and testified at the hearing. (R. 40-67.) The ALJ found Plaintiff was not disabled under the Act and denied her application. (R. 18-33.) A timely appeal was taken to the Appeals Council, and on February 17, 2012, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the decision of the Commissioner. (R. 1.)

On April 4, 2012, Plaintiff filed a Complaint with this Court objecting to the Commissioner's final decision and requesting an award of benefits or remand to the Commissioner. (Doc. 1.) Defendant filed an answer on June 5, 2012. (Doc. 7.)

Pursuant to Local Rules 83.40.4 and 83.40.5 Plaintiff filed her brief in support of her appeal of the denial of her claim on July 18, 2012. (Doc. 9.) Plaintiff identifies three errors: 1) the ALJ did not comply with Social Security Ruling ("SSR") 00-4p in that he failed to resolve a conflict between the vocational expert's ("VE") testimony and the Dictionary of Occupational Titles

("DOT"); 2) the ALJ improperly relied on the VE's testimony because that testimony was inaccurate and incredible; and 3) the ALJ failed to give a good reason for rejecting the opinion of Dr. VanGeisen who concluded that Plaintiff was able to sit for four hours per day and stand/walk for an hour or less over the course of an eight-hour workday. (Doc. 9 at 4.)

Defendant filed her brief on August 17, 2012. (Doc. 10.) Defendant maintains Plaintiff's asserted errors are without merit. (*Id.*)

Plaintiff filed a reply brief on August 22, 2012. (Doc. 11.) With this filing, Plaintiff again asserts the previously identified errors (elaborating on some) and concludes there are multiple harmful defects in the ALJ's decision. (*Id.*)

## B. *Factual Background*

Plaintiff was born in November 30, 1961, and was forty-eight years old when the Decision was issued. (R. 15, 396.) The highest grade she completed was tenth grade. (R. 44.) Plaintiff left school after being hit by a car and suffering a fractured pelvis and broken femur. (R. 51.) She had no additional education or training after she left high school. (R. 57.) Plaintiff has prior work experience as a school bus driver and dump truck operator. (R. 278.) She last worked as a dump truck driver and spent several weeks out of work following a cervical discectomy and fusion on February 12, 2009. (R. 62, 1084.)

Given Plaintiff's lengthy medical history and voluminous medical records (*see* R. 288-1323), our recitation of Plaintiff's impairment related background focuses on her identified impairments from the claimed date of onset, March 26, 2008 (R. 204, 208).

## 1. *Shorter Leg Impairment*

The shorter leg impairment noted by Plaintiff (R. 237) is a result of the broken pelvis and femur which she sustained in the car accident while she was in high school. (R. 52.) At the ALJ hearing, Plaintiff's attorney asked Plaintiff whether "there is anything residual, any kind of pain or anything." (R. 52.) Plaintiff responded "[w]hen the weather's been – yeah, just in my lower back and my pelvic bones mainly." (R. 52.) She added that it was numb where the scar is located and, as she grew older, she started having back pain." (*Id.*)

## 2. *Back Problems*

Plaintiff's "back problems" (R. 237) have resulted in "a long history of chronic neck pain and chronic low back pain with pain extending into her legs." (Doc. 9 at 5 (citing R. 960, 977, 1016, 1022-23).) Plaintiff alleges documented degenerative disc disease with radiculopathy in both cervical and lumbar spine. (Doc. 9 at 5 (citing R. 1078, 1280).)

## a. Lower Back Pain and Treatment

Evidence cited relates to the alleged disability time frame beginning with a York Memorial Hospital Outpatient Emergency

4

Department Record on March 8, 2008, when Plaintiff presented with left lower back pain with radiation to her left gluteal and posterior thigh regions.  (R. 1022.)  Plaintiff reported she had been moving some heavy boxes a week before her hospital visit and experienced some mild discomfort which resolved.  (R. 1022.)  She had again done some "mild moving of similar objects" which resulted in the presenting symptoms.  (*Id.*)  The report also states that Plaintiff has a history of degenerative disc disease, a condition treated by Dr. Nachtigall.[2]  (*Id.*)  She had been using Tylenol arthritis medication with minimal relief.  (*Id.*) She stated that heat helped to resolve the symptoms.  (*Id.*)  The "Treatment" portion of the report is blank.  (R. 1023.)  "Clinical Impression" indicates lumbar radiculopathy and sciatica.  (*Id.*)

On March 10, 2008, Plaintiff saw Asit P. Upadhyay, D.O., at York Rehab & Pain Consultants, Inc.  (R. 570.)  Dr. Upadhyay treated Plaintiff with injections and prescribed high dose steroids and Dilaudid for more severe pain.  (*Id.*)  Plaintiff continued to receive lumbar spine injections from Dr. Upadhyay, at least through February 2010.  (Doc. 10 at 2-3 (citing R. 552-71, 751-91, 949-1000, 1135-1250).)  On March 31, 2008, Plaintiff saw Dr. Upadhyay

---

[2]  Upon referral of Kieran P. Knapp, D.O., Dean A. Nachtigall, D.O., began treating Plaintiff on November 27, 2007, for low back pain and radicular right leg pain.  (R. 1016.)  At the time, Nr. Nachtigall treated Plaintiff with a corticosteroid injection "to optimistically break the acute exacerbation."  (*Id.*)

for follow-up evaluation of back pain. (R. 781.) She reported an "aching stabbing sensation" and also reported that previous injections significantly reduced pain. (*Id.*)

On March 13, 2008, Plaintiff saw Dr. Nachtigall. (R. 659.) He reported acute exacerbation over the past week, severe pain, positive straight leg raising. (*Id.*) He offered her Percoset for the pain. (*Id.*) Plaintiff's treatment plan included Vicodin for pain, an MRI and x-rays for further evaluation, and physical therapy for assessment and assistance with ambulation and a back exercise program. (*Id.*)

On March 14, 2008, Plaintiff returned to the hospital reporting the acute onset of pain had occurred one week previously after moving some boxes. (R. 414.) The pain had not been relieved with an epidural injection or narcotic medications so Dr. Nachtigall admitted her to the hospital for pain control and further evaluation. (*Id.*)

On April 1, 2008, Dr. Nachtigall reported that the epidural cortisone injection resulted in improvement of her left leg symptomology and her MRI study revealed a bulging disc. (R. 653.) He offered Plaintiff prescriptions for Vicoden and Soma and also encouraged walking for back strengthening. (*Id.*)

On June 24, 2008, Dr. Nachtigall's notes referred to the acute exacerbation of Plaintiff's low back problem (which occurred after lifting an air conditioner) and stated that the MRI study of March

17, 2008, showed no evidence that surgical intervention was required.  (R. 652.)

On June 25, 2009, Dr. Upadhyay documented that Plaintiff described her pain "as an aching constant pain, a 6 on average, better with heat, worse with cold."  (R. 960.)  He reported she was "doing well on her current medications on NSAID combined with anti-inflammatories and muscle relaxers."  (*Id.*)

**b.   Cervical Spine Pain and Shoulder Injury**

Following a fall which occurred on December 27, 2008, Plaintiff was seen by Orthopaidic & Spine Specialists, P.C., on December 29, 2008, and diagnosed with a greater tuberosity fracture with minimal displacement.  (R. 1075.)  The report states Plaintiff was employed as a truck driver at the time.  (*Id.*)

At her two-week follow-up appointment, Plaintiff was seen by Michael J. Moritz, M.D.  (R. 1077.)  Dr. Moritz noted the tuberosity fracture was healing well and also noted "[p]ossible cervical radiculopathy, affecting right arm."  (R. 1077.)  On January 26, 2009, Dr. Moritz again saw Plaintiff who complained of persisting left hand numbness with pain radiating down her arm. (R. 1078.)  Following x-rays of the cervical spine, Dr. Moritz diagnosed cervical disc degeneration and cervical radiculopathy, left arm.  (*Id.*)  Plaintiff was given a soft collar and recommended moist heat.  (*Id.*)  She requested narcotics, but the strongest pain medication Dr. Moritz would prescribe was Darvocet.

(*Id.*)  He also ordered an MRI of the spine to determine the severity of the disc problem in her neck.  (*Id.*)

On February 2, 2009, Dr. Moritz saw Plaintiff for follow-up of her cervical MRI.  (R. 1082.)  Finding that the MRI showed significant disc problems, he determined referral to a cervical surgeon to be appropriate.  (*Id.*)

On February 3, 2009, Plaintiff was seen by Kamran Majid, M.D., who noted historically that Plaintiff had neck pain for one year and did not recall an injury.  (R. 1080.)  He also noted that Plaintiff was laid off at the time.  (*Id.*)  Diagnostic studies revealed Plaintiff had "C5-6 spondylosis with a moderate amount of cord compression and a left-sided disk herniation."  (R. 1081.)  Dr. Majid discussed nonoperative and operative management with Plaintiff.  (*Id.*)  Plaintiff chose operative intervention.  (*Id.*)

Dr. Majid performed a cervical discectomy and fusion on February 12, 2009, to treat her cervical spondylosis.  (R. 1084-85.)  At her February 20, 2009, follow-up appointment, Plaintiff reported some numbness on the left side of her neck and continued right shoulder pain but her hand symptoms had resolved.  (R. 1083.)

At her next appointment on March 10, 2009, Dr. Majid treated Plaintiff's continuing shoulder pain with an injection, lifted her restrictions, allowed her to drive, prescribed physical therapy, and gave her prescriptions for Soma and Percocet.  (R. 1089.)

On March 27, 2009, Plaintiff's chief complaint was right

shoulder pain.  (R. 1090.)  She reported no improvement following

the injection during her previous visit.  (*Id.*)  Dr. Majid further

noted that Plaintiff "is also taking Vicodin and taking muscle

relaxants for pain.  She reports that she is not real interested to

return to work yet and that she has not recovered 100%."  (*Id.*)

Dr. Magid decided to request an evaluation and treatment by a

sports specialist at Orthopaedic and Spine Specialists, PC,

regarding her right shoulder pain.  (*Id.*)  He also requested the

involvement of a chronic pain specialist.  (*Id.*)

> She is currently taking narcotic medications
> and does not wish to wean off them.  I am
> requesting an evaluation and treatment by a
> chronic pain specialist because I feel the
> patient may require long-term narcotic
> medications due to dependence.  I will see
> the patient again at 6 weeks.  At that time I
> will advise her that she should make
> arrangements to return to work; however, she
> does not wish to work right now.  At 6 weeks
> I will have to send her back to work;
> otherwise, long-term disability will have to
> be worked out with her family physician.

(R. 1090.)

On March 30, 2009, Dr. Moritz saw Plaintiff for a follow-up

regarding her right shoulder.  (R. 1091.)  He noted that her x-rays

looked excellent.  (*Id.*)  He stated that an MRI would be

appropriate "to make sure the cuff is okay before saying everything

is ok."  (*Id.*)  Dr. Moritz added "[w]e did give her another

prescription for Percocet #20.  She said the Vicodin made her sick.

I think she does have a dependency problem, and she is made aware

of that." (*Id.*)  Dr. Moritz concluded his report by stating that "[t]he patient may return to full duties at work on 4/6/09."  (R. 1092.)

Dr. Moritz again saw Plaintiff on April 9, 2009, for a follow-up on the MRI study of her right shoulder which was done on April 6, 2009.  (R. 919, 1093.)  The MRI showed impingement which was not severe.  (R. 1093.)  Dr. Moritz injected the shoulder with Depo-Medrol and Xylocaine.  (*Id.*)  He told Plaintiff he did not need to see her again unless she had continued trouble.  (*Id.*)  He advised her to follow up with Dr. Majid for her neck.  (*Id.*)  Under "Work Status," Dr. Moritz noted that Plaintiff is working.  (R. 1094.)

At Plaintiff's April 24, 2009, appointment, in the history portion of the record Dr. Moritz noted that Plaintiff was still in the postop period for her neck and Dr. Majid was at a loss to do much else for Plaintiff.  (R. 879.)  He further noted that he thought Plaintiff had an addictive personality and that she was addicted to narcotics at the time--he discussed this openly with Plaintiff.  (*Id.*)  Dr. Moritz added

> [s]he has had significant psychological trauma, including death of a child and her husband.  I think the realities are this is a significant situation for her.  We may not ever help her completely but I think at this point, we should not deny her surgery if we think it could help her.

(R. 879.)  Dr. Moritz opined that her right shoulder problems all started with the December 2008 tuberosity fracture and she did well

with that healing but, based on the MRI, he thought "she probably has a little small tear and a degeneration of the insertion with impingement." (R. 879.) Noting Plaintiff's symptoms were "all when she reaches out to the side," he added that she reported a component of pain with rest. (*Id.*) Dr. Moritz felt an arthroscopic evaluation and decompression would be appropriate with the biggest concern being difficulty with rest pain postop. (*Id.*) Dr. Moritz further noted that if her neck is an issue, it would give her trouble in the postop period. (*Id.*)

On May 6, 2009, Dr. Moritz performed arthroscopy of Plaintiff's right shoulder with debridement, acromioplasty and acromioclavicular joint resection with no complications. (R. 1099.)

On June 3, 2009, Plaintiff saw Dr. Moritz for a follow-up visit. (R. 1065.) He found Plaintiff was doing "quite well" in relation to her shoulder, stating "[w]e are really finished as far as our activities." (*Id.*) He noted the mild discomfort she was experiencing was most likely referred from the neck. (*Id.*) The clinical exam showed the following: full range of motion; no weakness detected; bicep, tricep and abduction normal; and normal grip strength. (*Id.*) Dr. Moritz encouraged active use and normal activity. (*Id.*) The "Work Status" portion of the report noted that Plaintiff was on temporary disability and could return to work on July 4, 2009, "full duties." (*Id.*)

11

### 3. Broken Arms

Plaintiff's reported "broken arms with numerous surgeries" (R. 237) relate to both arms having been broken and numerous surgeries on her left arm. (Doc. 9 at 5 (citing R. 674, 1003, 1008).) Plaintiff reports the bone did not heal correctly so it had to be broken again. (R. 54.) Dr. Nachtigall performed the surgery on January 24, 2007. (R. 674.) While the left arm was in a cast, she fell and broke her right arm. (R. 54.) Plaintiff also reports that both arms ache when the weather is cold and rainy. (R. 54.)

### 4. Other Impairments of Record

Though not noted in the disability form filled out by Plaintiff (R. 237), Plaintiff identifies Hepatitis B and C and severe depression with suicide attempts as additional impairments. (Doc. 9 at 5, 6.)

### a. Hepatitis

Plaintiff states that she has Hepatitis B and C. (Doc. 9 at 5 (citing R. 53, 736-37).) A review of the record citations shows that Plaintiff confirmed at the ALJ hearing that she had been diagnosed with Hepatitis B and C but she did not identify any related effects or limitations. (R. 53.) Similarly, the other record citation provided by Plaintiff is diagnostic only. (R. 736-37.)

### b. Depression

Plaintiff states that in addition to her physical impairments

she suffers from severe depression with multiple suicide attempts and periods of mental decompensation. (Doc. 9 at 7 (citing R. 59-60, 526, 1004).) She received inpatient treatment based on suicidal thoughts and substance abuse following a second DUI on October 29, 2009. (Doc. 9 at 7 (citing R. 1131-32).)

The record citations include Plaintiff's testimony that she had mental health problems since she was a child but never recognized them, that she had multiple suicide attempts, that she was in treatment at the time, and that her drinking was self-medicating at a time when she was taken off morphine and Vicodin was not helping. (R. 59.) "Depression" was an impression found at Plaintiff's October 8, 2007, visit to Dr. Kieran Knapp.[3] (R. 526.) In the history portion of the record, Dr. Knapp recorded "[o]ff work since last week, 'nerves shot', can't keep anything down for 2 weeks, no appetite, can't concentrate, crying all the time, not able to sleep, feeling down all the time, unable to function with daily activities." (R. 526, 1004.)

At her follow-up visit two weeks later on October 22, 2007, "Anxiety-depression" was an impression found and the record contains the notation that Plaintiff "is not crying anymore but does not feel her depression is resolved or improved, tired all the time." (R. 526, 1004.) Depression and/or anxiety is not noted in records of Plaintiff's office visits to Kr. Knapp on August 26,

---

[3] Dr. Knapp appears to have been Plaintiff's treating general practitioner based on office visits of record. (R. 524-27).

2006, March 7, 2007, and May 30, 2008. (R. 526-27.) In the Bureau of Disability Determination letter to Dr. Knapp requesting records, Dr. Knapp was asked whether he would be willing to perform an additional examination or test on Plaintiff should either be needed to complete her disability claim. (R. 525.) Dr. Knapp answered "no." (*Id.*)

In support of her severe depression claim, Plaintiff also points to the record of the Wellspan Behavioral Health Psychiatric Evaluation dated January 14, 2010. (R. 1131-32.) She was admitted to Roxbury Treatment Center from October 30, 2009, to November 10, 2009, and diagnosed with "MDD, Recurrent, PTSD; Alcohol Dependence; opiate dependence." (R. 1131.) On January 14, 2010, Plaintiff was given a GAF score 45-50. (R. 1132.)

### 5. *Consultative Reports*

The record contains a consultative report from Peter VanGeisen, M.D., who examined Plaintiff on November 12, 2008. (R. 728.) The record also contains a non-examining report dated May 8, 2009, from Jay Shaw, M.D. (R. 865.)

### a. **VanGeisen Report**

Dr. VanGeisen, a physician with Orthopaedic and Spine Specialists, provided a disability examination at the request of the Bureau of Disability. (R. at 726-34.) On the Range of Motion Chart, Dr. VanGeisen recorded that Plaintiff measured 0-150 degrees on both right and left on an elbow flexion-extension scale of 0-150

14

degrees.  (R. 731.)  On 0-80 degree supination and pronation scales, Plaintiff measured 0-70 on both right and left.  (*Id.*)  Examination of the lumbar spine showed 0-80 degree flexion and extension on a scale of 0-90 degrees.  (R. 732.)  Lateral flexion was 0-10 degrees on a scale of 0-20 degrees.  (*Id.*)  Dr. VanGeisen's assessment of Plaintiff's ability to perform work-related physical activities includes the following findings: Plaintiff could lift and carry two to three pounds frequently and ten pounds occasionally; she had the capacity to stand for one hour or less and sit for four hours; she was limited in her upper and lower extremity ability to operate hand and/or foot controls; Plaintiff could occasionally bend, kneel, stoop, crouch, balance, and climb; she had limitations in her reaching, handling, fingering, and feeling abilities; and in the "Environmental Restriction" category "humidity" was identified.  (R. 730.)  Where asked to describe the nature and degree of an identified limitation, Dr. VanGeisen did not do so.  (R. 730-31.)  Where the questionnaire requests that the examiner provide "[s]upportive medical findings, if not included in report," Dr. VanGeisen provided no supportive data.  (R. 730.)

In his report, Dr. VanGeisen confirmed that he had "reviewed the Medical Historoy Questionnaire which includes review of systems, past medical, social, and family history dated 11/10/08."  (R. 729.)  His objective findings included that Plaintiff could

15

"go from a sitting to a standing position without difficulty." (R.
729.) She could also bend at the waist with fingertips to her
ankles. (*Id.*) In the "Diagnostic Studies" section of the report,
Dr. VanGeisen stated his review of the records showed Plaintiff had
an MRI of the lumbar spine dated March 15, 2008, which demonstrated
"degenerative disc disease at L2-3 to L5-S1 with degenerative
endplates at L5-S1." (R. 729.) This section of the report also
notes that an MRI of the left wrist was essentially normal. (*Id.*)
Dr. VanGeisen provided a diagnosis of low back pain and
degenerative disc disease. (R. 729.) He recommended vocational
rehabilitation, sedentary work, continued follow-up with pain
management for her low back and strengthening activities, and anti-
inflammatory agents of choice. (R. 729.)

**b.   Shaw Report**

Jay Shaw, M.D., provided a non-examining report dated May 8,
2009. (R. 865.) In the "Exertional Limitations" category, Dr.
Shaw made the following findings: Plaintiff could lift up to twenty
pounds occasionally and ten pounds frequently; she could stand
and/or walk for about six hours in an eight-hour day; she could sit
for about six hours in an eight-hour day; Plaintiff's pushing and
pulling ability are unlimited other than the lift and carry
restrictions; she could occasionally climb, balance, stoop, kneel,
crouch, and crawl; and she had no established manipulative, visual,
communication, or environmental limitations. (R. 867-68.)

16

Dr. Shaw's report noted that Plaintiff alleged disability due to back problems, shorter leg, broken arms with numerous surgeries and neck fusion. (R. 870.) He also states that Plaintiff reports severe pain and alleges that her symptoms result in limitations in standing, walking, lifting, carrying, and bending. (*Id.*)

Dr. Shaw concluded the medical evidence established a medically determinable impairment of degenerative disc disease. (R. 870.) In evaluating this condition, he noted Plaintiff's February 12, 2009, C5-6 discectomy and fusion postoperative evaluations were indicative of good results, but, at the same time she had new allegations of right shoulder pain. (*Id.*) He noted that the orthopaedic surgeon reviewing the shoulder MRI diagnosed Plaintiff with tendonitis.[4] (*Id.*) Regarding her lumbar spine complaints, Dr. Shaw found that the March 15, 2008, MRI was not supportive of severe degenerative changes or presence of neuronal compression. (R. 870.)

Dr. Shaw found the evidence of record did not support Plaintiff's statements of the severity of pain. (R. 870.) The allegations were found to be not credible due to her narcotic dependence and lack of objective evidence.

Concerning Dr. VanGeisen's report, Dr. Shaw acknowledged the

---

[4] From the content and timing of Dr. Shaw's report, it appears he did not review Plaintiff's records after April 9, 2009-- the appointment where Dr. Moritz told Plaintiff he would not need to see her again unless she had continued trouble. (R. 1093.)

differing opinions.  (R. 870.)  Dr. Shaw viewed some of Dr.

VanGeisen's opinions to be an overestimate of the severity of the

functional restrictions which were not consistent with the evidence

in the claims folder.  (R. 870-71.)  Dr. Shaw opined that Dr.

VanGeisen relied heavily on Plaintiff's subjective reports of

symptoms and limitations.  (R. 871.)

### 6.    *Vocational Expert Testimony*

Vocational Expert Sheryl Bustin testified at the ALJ hearing.

(R. 79.)  The ALJ first posed a hypothetical question as to whether

an individual with certain limitations could perform Plaintiff's

past work as a school bus driver or dump truck driver.  (R. 79-81.)

> Well, I would like you to assume . . . a
> hypothetical individual who is 48 years old
> and does not have a high school education,
> but rather has completed 10th grade and most
> of 11th grade; who has the exertional
> standing, and walking, and sitting abilities
> that are equivalent to sedentary, but who
> requires the ability to sit, stand, move
> about at will, or change position at will.
> So that ability is to sit or stand at will,
> not to move about; who can lift and carry ten
> pounds occasionally, and two to three pounds
> frequently; who is limited in both in [sic]
> lifting -- I mean, I'm sorry, who is limited
> in pushing and pulling with both the upper
> and the lower extremities to only occasional
> as opposed to frequent; who is limited to
> occasional . . . [b]ending, kneeling,
> stooping, crouching, balancing, and climbing;
> who is limited to occasional manipulations
> with handling, fingering, and who's reaching
> is also limited to occasional; who should be
> limited to only occasional exposure to
> humidity.  This person also should be limited
> to understanding, remembering, and carrying
> out simple instructions; should not be

18

> exposed -- or should not be required to
> engage in arithmetic other than single digit.
> Can interact appropriately with the public,
> coworkers, and supervisors on a frequent but
> not constant basis.  Can that individual,
> hypothetical individual, perform either of
> the positions of school bus driver or truck
> driver heavy?

(R. 80-81.)  The Vocational Expert ("VE") testified that the hypothetical individual could not perform either job.  (R. 81.)

The ALJ then asked if there were jobs in the regional and national economy which the hypothetical individual could perform. (R. 82.)  The VE identified four positions: receptionist information clerk, security system monitor, bakery worker conveyor line, and table worker quality control, adding some qualifications regarding the receptionist information clerk and security system monitor jobs in her initial response.  (R. 82-83.)  After the VE explained the bakery worker conveyor line position, the ALJ added that the VE should also assume that the hypothetical individual cannot work around the production of food.  (R. 83.)  There was no further discussion of this position.

Plaintiff's attorney then questioned the VE, inquiring whether the jobs identified require reaching, handling, and fingering.  (R. 84.)  The VE initially stated the security monitor involves no use of the hands but adjusted that to occasional.  (*Id.*)  She stated the information clerk involves only occasional use of the hands and the table worker quality control requires occasional handling, reaching and fingering.  (*Id.*)

19

Plaintiff's attorney also asked whether the hypothetical individual could perform any of the identified jobs if the VE assumed the hypothetical person could stand for one hour and sit for four hours total in a day. (R. 84.) The VE answered in the negative. (R. 84-85.) The VE also stated that an individual with a GAF score under 50 would not be able to work. (R. 86.) Similarly, an individual who had to take an unscheduled nap twice daily would not be able to perform the identified jobs. (R. 87.)

## II. Disability Determination Process

The Commissioner is required to use a five-step analysis to determine whether a claimant is disabled.[5] It is necessary for the Commissioner to ascertain: 1) whether the applicant is engaged in a substantial activity; 2) whether the applicant is severely

---

[5] "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less that 12 months . . . ." 42 U.S.C. § 423(d)(1)(A). The Act further provides that an individual is disabled

> only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A).

impaired; 3) whether the impairment matches or is equal to the requirements of one of the listed impairments, whereby he qualifies for benefits without further inquiry; 4) whether the claimant can perform his past work; 5) whether the claimant's impairment together with his age, education, and past work experiences preclude him from doing any other sort of work. 20 C.F.R. §§ 404.1520(b)-(g), 416.920(b)-(g); *see Sullivan v. Zebley*, 493 U.S. 521, 110 S. Ct. 885, 888-89 (1990).

The disability determination involves shifting burdens of proof. The initial burden rests with the claimant to demonstrate that he or she is unable to engage in his or her past relevant work. If the claimant satisfies this burden, then the Commissioner must show that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform. *Mason v. Shalala*, 993 F.2d 1058, 1064 (3d Cir. 1993).

The instant decision was decided at the fifth step of the process. (R. 32.) The ALJ found there are jobs that exist in the national economy that Plaintiff could perform. (*Id.*)

In his decision issued on July 1, 2010, the ALJ identified the following specific findings of fact and conclusions of law:

> 1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2012.
>
> 2. The claimant engaged in substantial gainful activity during the following periods: July 2008 through January 2009 (20 CFR 404.1520(b), 404.1571 *et seq.*,

21

416.920(b) and and 416.971 *et seq.*).

3. [T]here has been a continuous 12-month period(s) during which the claimant did not engage in substantial gainful activity. The remaining findings address the period(s) the claimant did not engage in substantial gainful activity.

4. The claimant has the following severe impairments: depression, cervical degenerative disc disease with radiculopathy; osteoarthritis; uneven leg length; status post cervical diskectomy and fusion of C5-C6; status post open reduction and internal fixation with plating of the left ulna; and status post debridement, acromioplasty, and acromioclavicular joint resection of the right shoulder (20 CFR 404.1520(c) and 416.920(c)).

5. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

6. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except the following: can lift 10 pounds occasionally and 2-3 pounds frequently; must be able to sit and stand at will; limited to occasional pushing and pulling with upper and lower extremities; limited to postural activities on an occasional basis; limited to occasional handling, fingering, and reaching; limited to occasional exposure to humidity; and understand, remember, and carry out simple, not detailed instructions;

limited to single digit math; and can interact with the public, coworkers, and supervisors on a frequent, but not constant basis.

7.    The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

8.    The claimant was born on November 30, 1961 and was 46 years old, which is defined as a younger individual age 45-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

9.    The claimant has a limited education and is able to communicate in English (20 CFR 404.1564 and 416.964).

10.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

11.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

12.    The claimant has not been under a disability, as defined in the Social Security Act, from March 26, 2008, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(R. 20-33.)

### III. Standard of Review

This Court's review of the Commissioner's final decision is

limited to determining whether there is substantial evidence to support the Commissioner's decision. 42 U.S.C. § 405(g); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999). A reviewing court is "bound by the ALJ's findings of fact if they are supported by substantial evidence in the record." *Plummer v. Apfel*, 186 F.3d 422, 427 (3d Cir. 1999). Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Plummer*, 186 F.3d at 427 (quoting *Ventura v. Shalala*, 55 F.3d 900, 901 (3d Cir. 1995)); *see also Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 359 (3d Cir. 2011). Therefore, we will not set aside the Commissioner's final decision if it is supported by substantial evidence, even if we would have reached different factual conclusions. *Hartranft*, 181 F.3d at 360 (*citing Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190-91 (3d Cir. 1986); 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . .")). "However, even if the Secretary's factual findings are supported by substantial evidence, [a court] may review whether the Secretary, in making his findings, applied the correct legal standards to the facts presented." *Friedberg v. Schweiker*, 721 F.2d 445, 447 (3d Cir. 1983) (internal quotation omitted). An ALJ's decision can

only be reviewed by a court based on the evidence that was before the ALJ at the time he or she made his or her decision. *Matthews v. Apfel*, 239 F.3d 589, 593 (3d Cir. 2001).

## IV. Discussion

### A. *General Considerations*

At the outset of our review of whether the ALJ has met the substantial evidence standard regarding the matters at issue here, we note the Third Circuit has repeatedly emphasized the special nature of proceedings for disability benefits. *See Dobrowolsky v. Califano*, 606 F.2d 403, 406 (3d Cir. 1979). These proceedings are not strictly adversarial, but rather the Social Security Administration provides an applicant with assistance to prove his claim. *Id.* "These proceedings are extremely important to the claimants, who are in real need in most instances and who claim not charity but that which is rightfully due as provided for in Chapter 7, Subchapter II, of the Social Security Act." *Hess v. Secretary of Health, Education and Welfare*, 497 F. 2d 837, 840 (3d Cir. 1974). As such, the agency must take extra care in developing an administrative record and in explicitly weighing all evidence. *Dobrowolsky*, 606 F.2d at 406. Further, the court in *Dobrowolsky* noted "the cases demonstrate that, consistent with the legislative purpose, courts have mandated that leniency be shown in establishing the claimant's disability, and that the Secretary's responsibility to rebut it be strictly construed." *Id.*

25

Finally, the Third Circuit has recognized that it is necessary for the Secretary to analyze all evidence. If he has not done so and has not sufficiently explained the weight he has given to all probative exhibits, "to say that his decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." *Dobrowolsky*, 606 F.2d at 407. In *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981), the Circuit Court clarified that the ALJ must not only state the evidence considered which supports the result but also indicate what evidence was rejected. "Since it is apparent that the ALJ cannot reject evidence for no reason or the wrong reason, an explanation from the ALJ of the reason why probative evidence has been rejected is required so that a reviewing court can determine whether the reasons for rejection were improper." *Id.* at 706-07. However, the ALJ need not undertake an exhaustive discussion of all the evidence. *See*, *e.g.*, *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000). "There is no requirement that the ALJ discuss in its opinion every tidbit of evidence included in the record." *Hur v. Barnhart*, 94 F. App'x 130, 133 (3d Cir. 2004). Only where the ALJ rejects conflicting probative evidence must he fully explain his reasons for doing so. *See*, *e.g.*, *Walker v. Comm'r of Soc. Sec.*, 61 F. App'x 787, 788-89 (3d Cir. 2003) (citing *Kent v. Schweiker*, 710 F.2d110, 114 (3d Cir. 1983)). Further, the ALJ does not need to

use particular language or adhere to a particular format in conducting his analysis. *Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004). "[W]here [a reviewing court] can determine that there is substantial evidence supporting the Commissioner's decision, . . . the *Cotter* doctrine is not implicated." *Hernandez v. Commissioner of Social Security*, 89 Fed. Appx. 771, 774 (3d Cir. 2004) (not precedential).

## B. *Plaintiff's Alleged Errors*

As noted above, Plaintiff identifies three errors: 1) the ALJ did not comply with SSR 00-4p in that he failed to resolve a conflict between the VE's testimony and the DOT; 2) the ALJ improperly relied on the VE's testimony because that testimony was inaccurate and incredible; and 3) the ALJ failed to give a good reason for rejecting the opinion of Dr. VanGeisen who concluded Plaintiff was able to sit for four hours per day and stand/walk for one hour or less over the course of an eight-hour workday. (Doc. 9 at 4.) We will discuss each in turn.

### 1. *Social Security Ruling 00-4p*

### a. Sit/Stand Option

Plaintiff claims the ALJ's step five determination is error in that the ALJ relied on the VE testimony and the conflict between that testimony and the DOT regarding the sit/stand option in Plaintiff's RFC violates SSR 00-4p with the result that the step five determination is not based on substantial evidence. (Doc. 9

27

at 11.)  We conclude the ALJ did not err on this basis because this limitation was adequately addressed regarding two of the four positions suggested for Plaintiff.

SSR 00-04p addresses conflicts between VE testimony and the DOT.

> When there is an apparent unresolved conflict between the VE . . . evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the VE . . . evidence to support a determination or decision about whether the claimant is disabled.  At the hearings level, as part of the adjudicator's duty to fully develop the record, the adjudicator will inquire, on the record, as to whether or not there is such consistency.

SSR 00-4p, 2000 WL 1898704 (S.S.A. Dec. 4)

As noted above, with this claimed error Plaintiff's challenge to the ALJ's compliance with SSR 00-4p relates to the sit/stand option included in the RFC and presented to the VE in the ALJ's hypothetical.  (Doc. 9 at 12.)  The conflict allegedly arises because the sit/stand option is not referenced in the DOT.[6]  (*Id.*)

---

[6]  In *Emery v. Astrue*, Civ. A. No. 07-2482, 2008 WL 5272454, at *5 (E.D. Pa. Dec. 18, 2008), it was noted that the VE testified "there is not a sit stand option in the DOT and of the 12,000 jobs that are listed, there is no reference to a sit stand option."  The explanation provided was that "the reason there is no sit stand option is that the DOT leaves room for VE interpretation based on experience and other reference materials."  *Id.*

Though not directly applicable to this case, SSR 83-12 provides commentary on a claimant's need to alternate between sitting and standing positions, highlighting the difficulties associated with this limitation.  SSR 83-12, 1983 WL 31253, at *4; *see also Martin v. Barnhart*, 240 F. App'x 941, 945 (3d Cir. 2007)

Plaintiff asserts the ALJ recognizes the conflict in his Decision but did not elicit the required testimony at the hearing. (*Id.*)

We do not agree with Plaintiff's assessment of the situation presented here. In his RFC determination, the ALJ found Plaintiff has the capacity to perform sedentary work with limitations, including that she must be able to sit and stand at will. (R. 24.) In his hypothetical to the VE, the ALJ included this limitation by saying that the hypothetical individual could perform work at a sedentary level but was further restricted on several bases, including that she "requires the ability to sit, stand, move about at will." (R. 80.) A full reading of the VE's response indicates she implicitly acknowledged that the relevant DOT sections for the receptionist information clerk and surveillance system monitor positions did not expressly contain sit/stand options when she found that the overall numbers would be eroded (by about fifty percent) with such an option. (R. 82.) In general terms, the VE's observation that these positions allow change of position at will, is appropriately viewed as a vocational expert's application of her expertise, her "knowledge, experience, and observations" in the words of the ALJ. (*See* R. 33.) Her reduction in the number of positions based on the conflict is similarly appropriate.

Viewed in this context, the ALJ does not run afoul of SSR 00-

---

(not precedential); *Boone v. Barnhart*, 353 F.3d 203, 201-11 (3d Cir. 2004).

4p regarding the receptionist information clerk and surveillance monitor positions because he was not presented with an "apparent unresolved conflict." Rather, a fair reading of the colloquy here is that the ALJ was presented with a conflict (made apparent by the VE's testimony) and the VE resolved the conflict to the ALJ's satisfaction in the course of her testimony. In this context, the ALJ would be under no obligation to elicit further testimony from the VE on the sit/stand issue for the two positions for which the VE testified a reduction in numbers would be appropriate based on this limitation––the receptionist information clerk and surveillance monitor positions. Importantly, the ALJ acknowledges in his Decision that the VE's testimony is inconsistent with the DOT and further states there is a "reasonable explanation" for the discrepancy, identifying how it is accounted for. (R. 33.)

While a more detailed analysis would be preferable both in the dialogue between the ALJ and VE at the ALJ hearing and in the ALJ's Decision, we reject Plaintiff's urging to adopt an interpretation of SSR 00-4p which would preclude allowing an ALJ to make reasonable assumptions and preclude a VE from using shorthand language in matters about which the ALJ and VE are well versed. The approach we adopt to these difficult proceedings and technical matters is warranted both by commonsense and Third Circuit caselaw which clearly does not require formulaic language, *see*, *e.g.*, *Rutherford v. Barnhart*, 399 F.3d 546, 557-58 (3d Cir. 2005);

*Sargent v. Comm'r of Social Security*, 476 F. App'x 977, 980-81 (3d Cir. 2012) (not precedential).[7]

Importantly, our conclusion regarding the sit/stand option does not apply to the bakery worker and table worker positions because the VE made no mention of the sit/stand option in relation to these jobs. Thus, based on the reasoning set out above, any conflict related to these positions remained unresolved.

Defendant asserts generally that "the VE acknowledged a potential conflict and resolved it by reducing her estimates of jobs available in the identified occupations to the extent required." (Doc. 10 at 12.) However, in support of the assertion Defendant points only to the VE testimony regarding the information clerk and security system monitor jobs. (*Id.*) As noted above, because Defendant does not show, and the record does not reveal, any acknowledgment of the conflict regarding the sit/stand option for the bakery worker and table worker positions, any reliance on the VE's testimony that Plaintiff could perform these positions would not be substantial evidence supporting the ALJ's decision.[8]

---

[7] Because we conclude remand to the Commissioner is appropriate on other bases, and because, as noted in the text, a more full explanation of the sit/stand option issue would be preferable, upon remand the Commissioner is directed to address the sit/stand option in conjunction with any occupation(s) which are suggested as compatible with Plaintiff's RFC.

[8] Plaintiff rightly asserts in her reply brief that this is not a situation like that discussed in *Rutherford* where the positions identified by the VE were by way of example with the

However, as *Rutherford* points out, because the inconsistencies did not exist as to *all* of the jobs, the SSR 00-4p violation as to some of the jobs does not render the ALJ's decision devoid of substantial evidence. 399 F.3d at 557. Of the four jobs the VE originally identified as existing in significant numbers in the regional and national economy that an individual with Plaintiff's RFC could perform, two survive Plaintiff's sit/stand SSR 00-4p challenge--the receptionist information clerk and surveillance monitor positions. Other challenges to the ALJ's reliance on these positions will be discussed below.

### b.   Mathematical Development Levels

In her reply brief, Plaintiff asserts that Defendant acknowledges Plaintiff's RFC limitation to single-digit math is lower than the most basic math level provided for in the DOT.[9]

---

result that the inconsistencies did not cause the ALJ determination at step five to be devoid of substantial evidence. 399 F.3d at 557. While the observation is valid, the principle is not a fit here because, as noted previously in the margin, *no position* in the DOT references a sit/stand option. Even assuming this were not the case, here neither the ALJ's questions nor the VE's responses indicate that the information sought or given were exemplary in nature. (*See* R. 82-84.)

[9]   The GED math level was identified as an issue after Defendant noted that Plaintiff's GED reasoning level arguments proffered in relation to certain identified positions did not apply to the RFC limitations concerning simple instructions, math, and public contact. (Doc. 10 at 17-18.) Plaintiff obviously agreed with Defendant that math reasoning levels are addressed separately in the DOT. We concur with this assessment. Our review of the GED reasoning levels set out in Appendix C of the DOT shows that they relate to instructional levels but not to math or public contact limitations.

(Doc. 11 at 6.)  Plaintiff further asserts that the VE's testimony violates SSR 00-4p based on consideration of the GED math reasoning level because all the jobs cited by the VE include the most basic math level.  (*Id.*)

Defendant acknowledges that the DOT lists a math level of 2 for the receptionist information clerk position and a math level of 1 for the surveillance system monitor position.  (Doc. 10 at 19 (citing DOT § 237.367-018, 1991 WL 672187; § 379.367-010, 1991 WL 673244).)  Defendant also recognizes these math levels generally require more than the single-digit math limitation in Plaintiff's RFC.  (Doc. 10 at 19.)  However, Defendant does not find this discrepancy problematic, asserting "the VE's testimony in response to the ALJ's hypothetical specifying a limitation to one-digit arithmetic is substantial evidence that Plaintiff can indeed perform these jobs with a limitation to single-digit arithmetic." (Doc. 10 at 19.)

We are not persuaded that Defendant's position is consistent with the requirements of SSR 00-4p.  Considering a GED mathematical level of 1 (the most basic) which applies to the  surveillance system monitor position (*see* Doc. 10 at 19 (citing DOT § 379.367-010, 1991 WL 673244)), and Level 1's two-digit number requirement, DOT App'x C, 1991 WL 688702, the ALJ's limitation to single digit math presents a conflict.  Defendant's conclusion that the VE's testimony satisfies relevant requirements (Doc. 10 at 19) is not

supported by the record, relevant caselaw, or administrative provisions. As discussed above, conflicts between the DOT and a VE's testimony are addressed in SSR 00-4p. Recognizing this, Defendant notes

> [t]he DOT lists the *maximum* requirements of occupations as generally performed, not the range of requirements of a particular job as it is performed in specific settings and it is the function of the VE to provide more specific information about the demands of jobs in the local and national economy in order to supplement the generic descriptions of jobs in the DOT. SSR 00-4p, 2000 WL 1898704, at *3 (emphasis added).

(Doc. 10 at 19.) Importantly, Defendant does not point to any VE testimony resolving the conflict between the surveillance system monitor position's two-digit math requirement and the ALJ's limitation in Plaintiff's RFC to single-digit math. Contrary to Defendant's conclusion, the VE's mere identification of the position in response to the ALJ's hypothetical is not enough--the VE to provide "*more specific information* about the demands of jobs." SSR 00-4p, 2000 WL 1898704, at *3 (emphasis added).

Unlike the sit/stand option discussed above where the VE accounted for the discrepancy and adjusted her calculations accordingly (R. 82-83), the discrepancy between the RFC math limitation (a very specific finding in the ALJ's RFC determination (R. 24)), and the GED math levels for relevant positions was not addressed at all, either by the VE or ALJ. Therefore, the reasoning applied above to the conclusion that the sit/stand option

34

and related testimony did not run afoul of SSR 00-4p does not apply to the math reasoning level discrepancy.

Regarding consistency between the DOT and VE testimony, SSR 00-4p provides in part: "At the hearings level, as part of the adjudicator's duty to fully develop the record, the adjudicator will inquire, on the record, as to whether or not there is such consistency." Here the ALJ did not ask the VE whether such consistency existed. (*See* R. 79-89.) The only dialog relating to discrepancy was in the context of the sit/stand option discussed above.

The next question is whether this omission requires remand. The Third Circuit Court of Appeals has found that an apparent or actual violation of SSR 00-4p's inquiry requirement does not always require remand. Failure to ask the question is not grounds for remand where the error is harmless. *See*, *e.g.*, *Tisoit v. Barnhart*, 127 F. App'x 572, 575, n.1 (3d Cir. 2005) (not precedential). As an initial impression, here we cannot say the error is harmless because the DOT requirements for all of the positions identified require greater math skills than those in the RFC. (*See* R. 24.)

More specifically, in *Rutherford*, the Third Circuit Court found no violation because the VE did not describe the requirements of the jobs he believed the claimant could perform. 399 F.3d at 556-57. In *Jackson v. Barnhart*, 120 F. App'x 904 (3d Cir. 2005) (not precedential), the Court stated: "[b]y its langauge, SSR 00-4p

requires the ALJ to inquire about potential conflicts only  where the VE 'provides evidence about the requirements of a job or occupation.'"  *Id.* at 905-06.  Unlike *Rutherford* and *Jackson*, here the VE provided evidence about the jobs identified.  (R. 82-84.)  Therefore, the ALJ was not relieved of the obligation to inquire about potential conflicts.[10]

*Jackson* noted that, even if it was error for the ALJ to fail to solicit testimony about potential conflicts between the DOT and the VE's testimony, reversal is not warranted where the error is harmless because other substantial evidence of record supports the ALJ's opinion.  120 F. App'x at 906 (citing *Boone v. Barnhart*, 353 F.3d 203, 209 (3d Cir. 2003); *Jones v. Barnhart*, 364 F.3d 501, 506 (3d Cir. 2004)).  Here remand cannot be avoided on this basis Because the ALJ's decision at step five relied on the VE's testimony (R. 32-33) and we find no other evidence of record which would provide substantial evidence of a significant number of jobs that Plaintiff can perform.[11]

---

[10]  Although we found it appropriate to make certain inferences regarding the sit/stand option colloquy between the ALJ and VE, we do not find it would be proper to make the further finding that all potential conflicts were inferentially addressed in the shorthand exchange regarding the sit/stand limitation.  In other words, in the circumstances presented here, the brief exchange regarding the sit/stand option limitation did not relieve the ALJ of SSR 00-4p's general inquiry requirement.

[11]  Our review of the record shows that evidence supports a finding that Plaintiff is able to work, particularly reports from her treating physicians and a consultative physician.  (*See*, *e.g.*, R. 865-71, 1065, 1090.)  However, an opinion that someone is

Other Circuit Courts have found additional bases upon which to affirm an ALJ's decision in the SSR 00-4p context. The Seventh Circuit has ruled that "SSR 00-4p requires the ALJ to obtain an explanation only when the conflict between the DOT and VE's testimony is 'apparent.'" *Terry v. Astrue*, 580 F.3d 471 (7th Cir. 2009) (citing *Overman v. Astrue*, 546 F.3d 456, 463 (7th Cir. 2008)). *Terry* added that when the plaintiff did not identify any conflict at the hearing, "she would have to show that the conflict was 'obvious enough that the ALJ should have picked up on [it] without any assistance.'" *Id.* (quoting *Overman*, 546 F.3d at 463). *Overman* described the first step in the SSR 00-4p inquiry to be the "ALJ's 'affirmative obligation' to ask whether a vocational expert's evidence "conflicts with information provided in the DOT," 546 at 462, and concluded the ALJ had satisfied this step by asking the VE if his testimony was consistent with the DOT, *id.* at 463. The ALJ *wrongly* answered that it was. *Id.* It was in this context that *Overman* concluded where plaintiff's counsel failed to identify conflicts at the time of the hearing, she would have to show the

capable of work does not equate with the step five requirement that there are jobs that exist in significant numbers in the national and regional economy that the claimant can perform. The ALJ reviewed this evidence and determined the appropriate RFC limitations––limitations in some instances greater than those these physicians found. Thus, this is not a case where an unexplained conflict between a VE's testimony and the DOT does not necessarily require remand because other substantial evidence supports the ALJ's opinion.

conflicts were obvious. *Id.* *Terry* appears to have dispensed with the requirement that the ALJ satisfy the first step of the SSR 00-4p process in that the ALJ in *Terry* did not ask the VE if his testimony conflicted with the DOT. 580 F.3d 471.

Defendant would benefit from the *Terry* approach, but we decline to adopt it here. First, the Third Circuit has not adopted the *Terry* approach or directly addressed the issue. Second, the initial duty to inquire about consistency is not limited by the work "apparent." *See* SSR 00-4p. Finally, the *Terry* approach in some applications could run counter to the remedial nature of social security proceedings in that a defendant could prevail where a significant (though not "apparent") conflict exists and the ALJ (either unintentionally or intentionally) failed to ask the initial question of whether a conflict exists. This result is unacceptable given the Social Security Administration's general obligation to assist an applicant in proving her claim, *Dobrowolsky*, 606 F.2d at 406, and an ALJ's affirmative obligation to fully develop the record, *see*, *e.g.*, *Ventura v. Shalala*, 55 F.3d 900, 902 (3d Cir. 1995) (citations omitted).

In sum, the ALJ did not comply with SSR 00-4p regarding the GED mathematics reasoning level and this error applied to all positions identified by the VE. Because we find no basis upon which to excuse compliance, remand for further consideration of this issue is necessary.

*2.    **Accuracy and Credibility of Vocational Expert's Testimony***

In addition to the SSR 00-4p discrepancy issues discussed above, Plaintiff argues the VE's testimony was too inaccurate and too incredible to constitute substantial evidence.  (R. 14.) Plaintiff alleges specific problems associated with each position identified by the VE.  Although we have found remand necessary on the basis set out above, we will address Plaintiff's remaining arguments to identify the parameters of matters to be considered on remand.

**a.    Receptionist Information Clerk**

Plaintiff asserts that the VE's association of the receptionist information clerk position with "the person who gives the yellow tags downstairs" (R. 82) renders the VE's numbers of jobs available unreliable.  (Doc. 9 at 14.)  Plaintiff adds that the GED reasoning level of 4 for the position exceeds Plaintiff's RFC limitation to simple, not detailed instructions, single-digit math, and not constant exposure to the public.  (Doc. 9 (citing R. 24).)

Although there may be some merit in Defendant's argument that the similarities between the positions render the VE's testimony "substantial evidence" (Doc. 10 at 15-16), there is also merit in Plaintiff's position that the differences render the VE's testimony regarding the number of positions available unreliable (Doc. 9 at 14).  Because the Commissioner bears the burden of proof at step

five to show that the claimant who has been determined at step four to be unable to return to her past relevant work, can "make adjustment to other work in the national economy," 20 C.F.R. § 404.1520(a)(4)(i)-(v), *Smith v. Comm'r of Social Sec.*, 631 F.3d 632, 634 (3d Cir. 2010) (citing *Poulos v. Comm'r of Social Sec.*, 474 F.3d 88, 92 (3d Cir. 2007)), and because the VE did not cite the DOT number and job as exemplary, *see Rutherford*, 399 F.3d at 557, this issue should be further considered upon remand.

We turn now to Plaintiff's argument that the GED reasoning level of 4 for the position exceeds Plaintiff's RFC limitation to simple, not detailed instructions, single-digit math, and not constant exposure to the public. (Doc. 9 (citing R. 24).) As noted previously, the GED reasoning level applies only to the instructions limitation. Reasoning level 4 requires an individual to be able to "[a]pply principles of rational systems to solve practical problems and deal with a variety of concrete variables in situations where only limited standardization exists [and] [i]nterpret a variety of instructions furnished in written, oral, diagrammatic, or schedule form." DOT App'x C, 1991 WL 688702. Examples of the "rational systems" referred to are "bookkeeping, internal combustion engines, electric wiring systems, house building, farm management, and navigation." *Id.* Clearly the requirements of reasoning level 4 exceed Plaintiff's RFC limitation to carrying out simple, not detailed instructions (R. 24). As with

the mathematics limitation discussed above, the GED reasoning level of 4 called for in the DOT description of the receptionist information clerk position and the VE's identification of this position for an individual who is limited to carrying out simple, not detailed instructions creates a discrepancy which has not been properly addressed pursuant to SSR 00-4p.

Plaintiff's averment regarding exposure to the public also warrants attention. Plaintiff asserts that the job as described in the DOT is entirely based on contact with the public "and the VE made no distinction as to how busy the prospective worksites Minichino might work in could be in order to account for that limitation in the RFC." (Doc. 9 at 15.) Defendant acknowledges the "people-focused" nature of the position. (Doc. 10 at 15.)

There is no question that Plaintiff's RFC indicates a limitation as to her interaction with the public. (R. 24.) Defendant asserts that the limitation to "frequent, but not constant contact" (*id.*) was accounted for when the VE cited this position in response to the ALJ's hypothetical. (Doc. 10 at 19-20.) However, because the description of this position in the DOT describes duties which all involve interaction with the public (*see* DOT §237.367-018, 1991 WL 672187), the position arguably involves more than "frequent" contact (described as one-third to two-thirds of an eight-hour day (see R. 865)) which would be beyond

Plaintiff's RFC.[12]  Because we have determined remand is required,
the issue should be directly addressed if a VE asserts Plaintiff is
capable of performing a job which, by definition, is based entirely
on interaction with the public.

**b.    Security System Monitor**

Plaintiff maintains that the VE's testimony regarding the
security system monitor position is inaccurate because the VE
stated that the job "involves no use of the hands" and the DOT
description indicate the position clearly involves some use of the
hands.  (Doc. 9 at 15.)  Plaintiff adds the GED 3 reasoning level
appears to exceed the limitations provided in the RFC.  (*Id.*)

Plaintiff's assertion related to the inaccuracy of the VE's
assessment of the security system monitor position related to use
of the hands is without merit.  A review of the VE's testimony on
this issue shows some contradiction, but we conclude these
contradictions by themselves do not render the testimony
unreliable.  Plaintiff's attorney asked the VE the following
question: "For the jobs you described, . . . do they not require
reaching, handling, and fingering?"  (R. 84.)  The VE responded
that "the security system monitor I had reaching, handling, fingers

---

[12] A review of the DOT Appendix B – Explanation of Data,
People, and Things cited by Defendant (Doc. 10 at 19 (citing DOT
App'x B, 1991 WL 688701)) does not help to resolve the matter
because the Appendix provides information on the relationship
between workers and people in a generic occupation but does not
address frequency of contact.  DOT App'x C, 1991 WL 688702.

occasional.  These are all at--the security system monitor involves no use of the hands." (*Id.*)  While the VE's response is not a model of clarity, clearly her testimony indicates that the security system monitor position involves at most occasional reaching, handling, and fingering.  This is consistent with the RFC determined by the ALJ since the limitations on Plaintiff's sedentary work include that it is "limited to occasional handling, fingering and reaching."  (R. 24.)  Thus, we find no problem with the ALJ's reliance on the VE's testimony regarding this RFC limitation.

Plaintiff says only that the GED 3 reasoning level *appears* to exceed the RFC limitations.  (Doc. 9 at 15.)  She does not elaborate on the statement.  As discussed previously, the GED reasoning level would relate to the simple, not detailed instruction limitation but does not relate to the math or public contact limitation.  A GED reasoning level of 3 calls for the individual to "[a]pply commonsense understanding to carry out instructions furnished in written, oral, or diagramatic form,' [and] [d]eal with problems involving several concrete variables in or from standardized situations."  DOT App'x C, 1991 WL 688702.  By way of comparison, reasoning level 2 calls for the individual to "[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions [and] [d]eal with problems involving a few concrete variables in or from standardized

situations," *id.*, and reasoning level 1 calls for the individual to "[a]pply commonsense understanding to carry out simple one- or two-step instructions [and] [d]eal with standardized situations with occasional or no variables in or from these situations encountered on the job," *id.*

The ALJ's RFC states Plaintiff can "understand, remember, and carry out simple, not detailed instructions."[13] (R. 24.) Given the fact that level 2 requires an individual to carry out *detailed* instructions, level 3 reasoning would surpass Plaintiff's RFC limitation. This discrepancy and the apparent limitation of Plaintiff to positions requiring only level 1 reasoning (the only level which does not require the ability to carry out detailed instructions) should be addressed on remand.

Given the direct correlation of GED reasoning levels to abilities regarding instructions, we do not find persuasive Defendant's argument that the DOT's specific vocational preparation (SVP) levels govern this inquiry (Doc. 10 at 18). Thus, we will not further discuss Defendant's assertion that the SVP level of 2 for the Security Monitor position indicates the position is consistent with the limitation regarding simple, not detailed instructions. (*Id.*)

Finally, regarding the limitation on contact with the public

---

[13] In the ALJ's question to the VE, the hypothetical individual was "limited to understanding, remembering, and carrying out simple instructions." (R. 81.)

44

to a frequent (not constant) basis, insofar as the surveillance system monitor position requires the same level as the receptionist information clerk, reliance on the VE's testimony is problematic. As discussed regarding the receptionist information clerk position, the limitation to "frequent, but not constant contact" (R. 24) should be directly addressed when a VE asserts that the claimant is capable of performing a job which is completely based on interaction with the public. Simply identifying the position in response to a hypothetical is not enough.

**3.     Bakery Worker Conveyor Line**

As noted above, based on the VE's testimony and the ALJ's addition to the hypothetical that the individual cannot work around the production of food (R. 83), we conclude that the VE did not find that Plaintiff could perform this job with the limitations presented by her hepatitis.

**4.     Table Worker Quality Control**

Plaintiff asserts the VE's testimony that there were 500,000 such positions nationally and 700 locally is not reliable because the DOT code is for inspecting tiles and the VE "strayed from the definition in the code she provided, as she suggested the job included inspecting small machine parts."  (Doc. 9 at 15-16.)

Defendant counters that this argument is without merit:

> The table worker job fundamentally represents
> a quality control job, whether it involves
> working with "small machine parts, examining
> them for the coating or [to see if they are]

45

> painted correctly, or have any rough edges,"
> as described by the VE, or "examining squares
> (tiles) of felt-base linoleum material
> passing along on conveyor and replac[ing]
> missing and substandard tiles," as noted in
> the DOT narrative description (Tr. 83).  DOT
> § 739.687-182, 1991 WL 680217.

(Doc. 10 at 16.)  While Defendant's commonsense observation has
some merit, for basically the same reasons as our decision
regarding the VE's testimony about the number of receptionist
information clerk jobs available, we conclude this issue should be
clarified on remand.

### 3.  *Rejection of Consultative Examiner Limitations*

Plaintiff's final claimed error is that the ALJ failed to
provide a good reason for rejecting Dr. VanGeisen's opinion that
she could not work an eight-hour day.  (Doc. 9 at 16.)  Defendant
counters that substantial evidence supports Dr. VanGeisen's
opinion.  (Doc. 10 at 21.)  We conclude the ALJ's consideration of
the opinion is not error.

Dr. VanGeisen is not a treating physician.  As a one-time
examining physician he is not entitled to treating physician
deference.  *See* 20 C.F.R. §§ 404.1527(c), 416.927(c).  Of
particular note is Dr. VanGeisen's assessment in his report dated
October 27, 2008, that Plaintiff could sit for four hours and
stand/walk for one hour or less in the course of an eight-hour
workday and his recommendation that Plaintiff could do sedentary
work.  (R. 729-30.)  Plaintiff asserts that the recommendation for

46

sedentary work does not mean she is capable of sedentary work for eight hours a day in light of Dr. VanGeisen's standing/walking and sitting limitations. (Doc. 9 at 17.) Plaintiff further avers that the assessment and recommendation are not contradictory, relying on SSR 96-5p for the proposition that "'[a]djudicators must not assume that a medical source using terms such as 'sedentary' and 'light' is aware of our definitions of these terms.'" (Doc. 9 at 17 (quoting SSR 96-5p).)

We need not discuss what Dr. VanGeisen may have meant when he opined that Plaintiff could do sedentary work because we conclude the ALJ properly considered the opinion and was entitled to reject some findings and accept others in his assessment of the report's consistency with the entire medical record. (*See* R. 30.) Noting Dr. VanGeisen's standing/walking and sitting restrictions and his recommendation for sedentary work, the ALJ stated the report "appears to contain inconsistencies, and the inconsistent aspects are accordingly rendered less persuasive." (R. 30.) Importantly, the ALJ did not end there--he credited aspects of the opinion which were "consistent with objective medical evidence as a whole." (*Id.*) Seen contextually, the ALJ would not have rejected the standing/walking and sitting limitations if they were supported by objective medical evidence as a whole.[14] Moreover, the ALJ's

---

[14] As set out in the Background section of this Memorandum, where asked in the form report to describe the nature and degree of an identified limitation, Dr. VanGeisen did not do so. (R. 730-

Decision provided a detailed review of the record, including Dr. Moritz's and Dr. Magid's opinions that Plaintiff could return to work, opinions by treating physicians which post date Dr. VanGeisen's report.  (R. 30-31.) The ALJ also cited the lack of evidence that these treating physicians ever recommended permanent restrictions due to Plaintiff's impairments.  (R. 30-31.)  The ALJ noted Plaintiff's treating physicians' reports indicated some short term periods of disability but these periods were less than twelve months in duration.  (*Id.*)  In his reference to Dr. Shaw's report, the ALJ concluded the State Disability Determination Services non-examining source supported a finding of "not disabled."  (R. 31.) The ALJ recognized the report was not entitled to the weight of the treating and examining physicians, but found some weight appropriate due to the report's consistency with other evidence. (R. 31.)  These citations to the ALJ's decision exemplify the validity of the ALJ's reason for rejecting parts of Dr. VanGeisen's opinion.  Thus, Plaintiff's claimed error on this issue is without merit.

### V. Conclusion

This case exemplifies the difficult nature of Social Security proceedings.  Recognizing the challenges faced by the Social

---

31.)  Where the form requests that the examiner provide "[s]upportive medical findings, if not included in report," Dr. VanGeisen provided no supportive data.  (R. 730.)

Security Administration (particularly the ALJ where a hearing has been conducted) and the complex legal framework within which claims are analyzed, we must also keep in mind the reasons for the detailed obligations governing SSA decisions--real people with real problems deserve careful scrutiny of their claims.

Plaintiff is clearly a claimant with multiple physical problems, some psychological problems, and substance dependence issues. Her records indicate some long-term difficulties but also many short-term exacerbations of long-term problems and multiple accident/incident related problems. The number of treating physicians, overlapping visits and reports, and inferences which can be derived from some reports portray a picture of a pleasant, though sometimes difficult patient. (*See*, *e.g.*, R. 575, 879, 1090.) The ALJ's analysis of Plaintiff's claim and complex record is in most respects thorough and his findings well-supported. However, our consideration of the intricate requirements related to the step five determination, particularly as they apply to VE testimony, prevent affirmance.

Because we have found the VE's testimony on each of the suggested positions unreliable, because the ALJ relied on the VE's testimony to determine at step five that Plaintiff could "make an adjustment to other work" and was not disabled (R. 32-33), and because we find no other evidence in the record to support the ALJ's decision at step five, the ALJ's conclusion that Plaintiff in

not disabled is not supported by substantial evidence.  Thus,
Plaintiff's appeal of the Commissioner's denial of benefits (Doc.
1) is granted, and the case is remanded for further consideration
consistent with this Memorandum.  An appropriate Order is entered
simultaneously with this Memorandum.


                              S/Richard P. Conaboy
                              RICHARD P. CONABOY
                              United States District Judge

DATED: June 28, 2013